*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

AMERICAN SELECT INSURANCE COMPANY,

        Plaintiff-Appellee,

v

MICHELE INHMATHONG and RYAN CYONG
LE-NGUYEN,

        Defendants,

and

CAD, a minor, by Next Friend ARNOLD
CHRISTOPHER DANIEL,

        Defendant-Appellant.

FOR PUBLICATION
May 09, 2025
2:05 PM

No. 370037
Washtenaw Circuit Court
LC No. 22-001610-CK

Before: MURRAY, P.J., and M. J. KELLY and N. P. HOOD, JJ.

N. P. HOOD, J.

In this homeowner's insurance coverage dispute, CAD, by his next friend, Arnold Christopher Daniel, appeals by right the trial court's order granting summary disposition in favor of American Select Insurance Company (American Select) under MCR 2.116(C)(10). On appeal, CAD argues that the trial court erred by granting summary disposition in favor of American Select because it issued a homeowner's insurance policy to Michele Inhmathong that covered injuries he sustained when Inhmathong's live-in boyfriend, Ryan Cyong Le-Nguyen, shot him. We reverse and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

American Select issued a homeowner's insurance policy to Inhmathong that provided coverage for her home in Ypsilanti, Michigan between March 2021 and March 2022. Inhmathong was the sole named insured. The definitions section of the policy addressed commonly used verbiage and defined relevant terms as follows:

**A.** In this policy, **you** and **your** refer to the **named insured** shown in the Declarations and the spouse if a resident of the same household. **We**, **us** and **our**, refer to the Company providing this insurance.

**B.** In addition, certain words and phrases are defined as follows: They are bold italics when used.

* * *

**7. *Insured*** means:

>**a.** You and residents of your household who are:
>
>>**(1)** Your relatives; or
>>
>>**(2)** Other persons under the age of 21 and in your care or the care of a resident of your household who is your relative;

* * *

**10.** ***Occurrence*** means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:

>**a.** ***Bodily injury***; or
>
>**b**. ***Property damage***.

The policy did not define the term, "accident," as used within the definition of the term, "occurrence." Section II of the policy addressed liability coverage. It provided:

**A. Coverage E – Personal Liability**

>If a claim is made or a suit is brought against an ***insured*** for damages because of ***bodily injury*** or ***property damage*** caused by an ***occurrence*** to which this coverage applies, we will:
>
>>**1.** Pay up to our limit of liability for the damages for which an ***insured*** is legally liable. Damages include prejudgment interest awarded against the ***insured***; and
>>
>>**2.** Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when our limit of liability for the ***occurrence*** has been exhausted by payment of a judgment or settlement.

* * *

**E. Coverage E – Personal Liability And Coverage F – Medical Payments to Others**

Coverages **E** and **F** do not apply to the following:

**1. Expected Or Intended Injury**

*Bodily Injury* or *property damage* which is expected or intended by an *insured*, even if the resulting *bodily injury* or *property damage*:

**a.** Is of a different kind, quality or degree than initially expected or intended; or

**b.** Is sustained by a different person, entity or property than initially expected or intended.

However, this Exclusion **E.1.** does not apply to *bodily injury* or *property damage* resulting from the use of reasonable force by an *insured* to protect persons or property;

In June 2021, Le-Nguyen shot CAD in the front yard of Inhmathong's home by blindly firing through Inhmathong's living room window. The bullet struck CAD in the upper arm. Le-Nguyen was arrested shortly afterward. According to a police report, he told a Washtenaw County Sheriff's Office Detective that Inhmathong was his girlfriend, and they lived together in her home for over two years. Le-Nguyen worried about crime in the neighborhood and kept a revolver, a shotgun, and ammunition in the home. He had "confrontations" with neighborhood children in the past because they threw trash in the front yard of the home. He believed that the neighborhood children were disrespectful and recounted an incident when one of them called him a racial slur. Before shooting CAD, Le-Nguyen heard "banging sounds" outside. Fearing that the home would be shot at, Le-Nguyen blindly fired one shot through the living room window. He did not look outside before or after firing the shot.

In July 2021, CAD filed a complaint against Inhmathong and Le-Nguyen. He alleged that Le-Nguyen shot him in the arm as he attempted to retrieve his bicycle from their front yard. In Count 1, which he labeled as a negligence claim, CAD alleged that Inhmathong and Le-Nguyen negligently failed to inspect their residence for dangerous conditions, including loaded firearms, negligently failed to maintain their residence in a reasonably safe condition, and negligently failed to warn others that their residence was dangerous. In Count 2, which he did not label, CAD alleged that Inhmathong and Le-Nguyen created a nuisance by keeping a loaded firearm in their residence and maintaining a dangerous condition on the property. The complaint did not include a claim of civil assault and battery or other intentional tort claims.

During her deposition, Inhmathong testified that she and Le-Nguyen lived together in her home when Le-Nguyen shot CAD. Inhmathong had an on-and-off relationship with Le-Nguyen and described him as her housemate. She did not know whether Le-Nguyen had any "problems"

-3-

with the neighborhood children, nor did she receive any complaints from her neighbors about Le-Nguyen's behavior. She described the shooting as an "isolated and unusual" incident. Yet she knew that Le-Nguyen had at least one firearm in her home, and she told him to get rid of it "a couple of times." It is undisputed that Le-Nguyen is not Inhmathong's relative or otherwise an "insured" under the terms of the Inhmathong's homeowners insurance policy.

During his deposition, Le-Nguyen testified that he rarely spoke to the neighbors and did not have any "problems" with the neighborhood children running on the front lawn. He occasionally moved toys and bicycles that the neighborhood children left in the yard and driveway. He believed that Inhmathong's home was in a dangerous neighborhood because there were shootings and break-ins in the area. He purchased a revolver and a shotgun "for safety" and kept them in his bedroom. On the day Le-Nguyen shot CAD, he heard "loud bangs" outside of the home. The noises frightened him, and he blindly fired one shot through the window using his revolver.

During his deposition, Daniel testified that he lived next door to Inhmathong's home when Le-Nguyen shot CAD. Daniel knew Le-Nguyen before the shooting and described their relationship as "cordial." Daniel was never involved in any "conflict or confrontation" with Le-Nguyen. He also had "minimal interaction" with Inhmathong. He described Le-Nguyen and Inhmathong as "good neighbors."

In November 2022, American Select filed a declaratory-judgment action against Inhmathong, Le-Nguyen, and CAD. It sought a declaratory judgment stating that Inhmathong's homeowner's insurance policy did not provide coverage for defense or indemnity related to CAD's underlying claims against Inhmathong and Le-Nguyen.

After discovery closed, American Select moved for summary disposition under MCR 2.116(C)(10). It argued that the shooting was not an "occurrence" as defined by the homeowner's insurance policy because no "accident" occurred. It also argued that Inhmathong knew or should have known that the shooting would occur because Le-Nguyen kept guns in the home and had prior confrontations with the neighborhood children, and the homeowner's insurance policy expressly excluded coverage for expected harm.

In January 2024, the trial court granted American Select's summary disposition motion. Its order provided, in part:

> (1) Ryan Cyong Le-Nguyen is not an "insured" under the American Select Insurance Company Policy issued to Michele Inhmathong;
>
> (2) The Underlying Lawsuit (*Daniel v Le-Nguyen et. al.*, Case No. 21-000786-NO, pending in the Washtenaw County Circuit Court) does not allege an "occurrence" under the American Selective [sic] Insurance Company Policy;
>
> (3) The American Select Insurance Company does not provide coverage for the Underlying Lawsuit.

This appeal followed.

-4-

## II.  STANDARD OF REVIEW

We review de novo the construction and interpretation of an insurance contract.  *Lewis v Farmers Ins Exch*, 315 Mich App 202, 209; 888 NW2d 916 (2016).  We likewise review de novo a trial court's decision to grant or deny a motion for summary disposition.  *El-Khalil v Oakwood Healthcare Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019).  A motion under MCR 2.116(C)(10) tests the factual sufficiency of a claim.  *Id*. at 160.  When considering a motion under MCR 2.116(C)(10), the trial court must "consider all evidence submitted by the parties in the light most favorable to the party opposing the motion."  *Id*.  The trial court may only grant the motion if there is "no genuine issue of material fact."  *Id*.  "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ."  *Id*. (quotation marks and citation omitted).

## III.  LAW AND ANALYSIS

The trial court erred by granting summary disposition in favor of American Select under MCR 2.116(C)(10).  CAD's injury constituted an "occurrence" as defined in Inhmathong's homeowner's insurance policy, and there was at least a genuine issue of material fact regarding whether Inhmathong's homeowner's insurance policy excluded coverage based on her purported expectation that the shooting would occur.

"An insurance policy is an agreement between parties that a court interprets much the same as any other contract to best effectuate the intent of the parties and the clear, unambiguous language of the policy."  *Auto-Owners Ins Co v Harrington*, 455 Mich 377, 381; 565 NW2d 839 (1997) (quotation marks and citation omitted).  "To do so, the court looks to the contract as a whole and gives meaning to all its terms."  *Id*.  "Interpretation of an insurance policy ultimately requires a two-step inquiry: first, a determination of coverage according to the general insurance agreement and, second, a decision regarding whether an exclusion applies to negate coverage."  *Id*. at 382.  As it relates to the present case, this two-step inquiry poses two questions: first, whether there was an "occurrence" as defined in Inhmathong's homeowner's insurance policy, and second, whether Inhmathong's homeowner's insurance policy excluded coverage based on her purported expectation that the shooting would occur.

### A.  OCCURRENCE

The first part of the inquiry requires us to consider whether CAD's injury amounts to an occurrence, which under the terms of Inhmathong's homeowner's insurance policy is synonymous with an accident.  With the understanding that Inhmathong was the insured, not Le-Nguyen, CAD's injury was an accident and, by extension, an occurrence.  The trial court erred by concluding otherwise.

Inhmathong's homeowner's insurance policy defined an "occurrence" as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period," in bodily injury or property damage.  But it did not define the term "accident" as used within the definition of an "occurrence."  "An insurance policy must be enforced in accordance with its terms."  *Frankenmuth Mut Ins Co v Masters*, 460 Mich 105, 111; 595 NW2d 832 (1999).  "When the meaning of a term is not obvious from the policy language,

the commonly used meaning controls." *Id*. at 113-114 (quotation marks and citation omitted). Thus, unless otherwise defined within an insurance policy, the term "accident" should be defined according to its commonly used meaning. See *Allstate Ins Co v McCarn*, 466 Mich 277, 280; 645 NW2d 20 (2002). See also *Allstate Ins Co v Freeman*, 432 Mich 656, 669-670; 443 NW2d 734 (1989). An "accident" is not restricted to an unintentional act. *Freeman*, 432 Mich at 670. "[A]scertaining the insured's 'intent' may determine whether the insured's actions constituted an 'accident,' but it does not necessarily follow that an insured must act unintentionally for an act to be an 'occurrence.' " *Id*.

In *McCarn*, our Supreme Court interpreted a homeowner's insurance policy similar to the one at issue here. See *McCarn*, 466 Mich at 281-282. The policy used the term "accident" in the definition of an "occurrence" but did not otherwise define the term. *Id*. at 281. In interpreting the policy, the Court stated that it had repeatedly defined the term, "accident," as "an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated and not naturally to be expected." *Id*. (quotation marks and citations omitted). This definition applies to Inhmathong's homeowner's insurance policy as well. See, e.g., *Home-Owners Ins Co v Smith*, 314 Mich App 68, 74; 885 NW2d 324 (2016) (applying our Supreme Court's definition of the term, "accident," to a homeowner's insurance policy that used the term to define an "occurrence" but did not define the term itself).

"[T]he appropriate focus of the term 'accident' must be on both 'the injury-causing act or event and its relation to the resulting property damage or personal injury.' " *Id*., quoting *Masters*, 460 Mich at 115 (emphasis omitted). "[I]f both the act and the consequences were intended by the insured, the act does not constitute an accident." *McCarn*, 466 Mich at 282. "On the other hand, if the act was intended by the insured, but the consequences were not, the act does constitute an accident, unless the intended act created a direct risk of harm from which the consequences should reasonably have been expected by the insured." *Id*. at 282-283.

Our Supreme Court's opinion in *McCarn* followed its opinion in *Freeman*, which first adopted the definition of an accident under a similar homeowner's insurance policy. See *Freeman*, 432 Mich at 669-670. *Freeman*, a consolidated appeal, partially concerned a stabbing that occurred during an altercation between David DiCicco and James Gravenmier in a college residence hall. *Id*. at 663-664. DiCicco held a knife during the altercation but claimed he never intended to use it. *Id*. at 664. Gravenmier grabbed DiCicco by the throat and pushed him against a wall, after which he "felt the knife being withdrawn from his stomach." *Id*. Gravenmier sued DiCicco, claiming in part that he was insured under his parents' homeowner's insurance policy. *Id*. The insurer then sought a declaration that the policy did not cover the stabbing incident, contending that it was intentional and did not constitute an "occurrence," which the policy defined as an "accident." *Id*. at 665. The Court explained that an "accident" does not necessarily require an insured to act unintentionally and held that the stabbing constituted an "occurrence" under the policy. *Id*. at 671-672.

Many of the cases addressing this issue, including *McCarn*, involve an *insured* committing the act that constitutes the occurrence. See *McCarn*, 466 Mich at 279 (an insured inadvertently shot and killed a guest while handling a loaded firearm). See also *Vanguard Ins Co v McKinney*, 184 Mich App 799, 803-804; 459 NW2d 316 (1990) (an insured shot and killed another using a firearm owned by his father, an additional insured). This distinction requires us to pinpoint at the

threshold who is the insured and what is the alleged occurrence. Inhmathong is the insured, not Le-Nguyen. And the alleged occurrence is Inhmathong permitting the reckless handling and use of a firearm on her property, not Le-Nguyen's commission of a battery or some other intentional tort.[1] Indeed, both of CAD's underlying claims sound in negligence.[2]

In support of its contention that this Court should evaluate the shooting from Le-Nguyen's point of view to determine whether it constituted an accident, American Select relies on this Court's opinion in *Mich Basic Prop Ins Ass'n v Wasarovich*, 214 Mich App 319; 542 NW2d 367 (1995) and this Court's unpublished opinion in *Auto-Owners Ins Co v Nyhof*, unpublished per curiam opinion of the Court of Appeals, issued May 7, 2015 (Docket No. 320256).[3] But American Select's reliance on *Wasarovich* and *Nyhof* is misplaced. Both cases involved intentional torts, and *Wasarovich* specifically involved an intentional tort committed by the insured. See *Wasarovich*, 214 Mich App at 321. See also *Nyhof*, unpub op at 1. This case does not involve an intentional tort, let alone one committed by Inhmathong. Instead, this case is closer to *Freeman*, 432 Mich at 671-672, where an insured's choice to wield a knife led to an undesigned and unanticipated stabbing.

To determine whether the shooting was an accident and, by extension, an occurrence as defined by Inhmathong's homeowner's insurance policy, the relevant consideration is whether Inhmathong intended both the injury-causing act and its consequences. See *McCarn*, 466 Mich at 282. During her deposition, Inhmathong testified that she was at work when Le-Nguyen shot CAD and did not have first-hand knowledge of the events. Inhmathong characterized her relationship with her neighbors as cordial. She knew that the neighborhood children frequently ran on her front lawn but did not mind that they did so. She did not know whether Le-Nguyen had any "problems" with the neighborhood children before he shot CAD, nor did she receive any complaints from her neighbors about Le-Nguyen's behavior. She knew that Le-Nguyen had at least one firearm in her home and did not approve but described the shooting as an "isolated and unusual" incident based on what she knew about Le-Nguyen's behavior. Le-Nguyen's testimony was largely consistent with Inhmathong's. He testified regarding his belief that Inhmathong's home was in a dangerous neighborhood because there were shootings and break-ins in the area, and he spoke to Inhmathong "[a] couple of times" about the neighborhood children running on the

---

[1] Both parties have characterized the shooting as an intentional act without distinguishing between an intentional tort (i.e., battery) and various degrees of culpability (i.e., carelessness for negligence versus recklessness for gross negligence). This case does not involve an alleged intentional tort. Rather, it involves an allegation of negligent or grossly negligent conduct.

[2] We acknowledge that Count 2 is untitled but references nuisance. Nonetheless, the gravamen of the claim is negligence. See *Graziano v Brater*, 342 Mich App 358, 365; 994 NW2d 521 (2022) ("This Court looks beyond the mere procedural labels to determine the exact nature of the claim. The gravamen of an action is determined by considering the claim itself." (Quotation marks, brackets, and citations omitted)).

[3] "Although MCR 7.215(C)(1) provides that unpublished opinions are not binding under the rule of stare decisis, a court may nonetheless consider such opinions for their instructive or persuasive value." *Cox v Hartman*, 322 Mich App 292, 308; 911 NW2d 219 (2017).

front lawn and leaving garbage in the yard. Additionally, Daniel testified that he knew Le-Nguyen before the shooting occurred and described their relationship as "cordial." Daniel was never involved in any "conflict or confrontation" with Le-Nguyen. He also had "minimal interaction" with Inhmathong and described Le-Nguyen and Inhmathong as "good neighbors."

Based on the record testimony, there is no evidence that Inhmathong intended for Le-Nguyen to blindly fire a gun from inside her home, nor is there evidence that Inhmathong intended for the bullet to strike CAD. From Inhmathong's standpoint, the shooting was an accident in that it was "an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated and not naturally to be expected." See *id*. at 281. The trial court erred by concluding otherwise and, by extension, erred by concluding that there was no "occurrence" as defined by Inhmathong's homeowner's insurance policy. It therefore erroneously granted summary disposition in American Select's favor under MCR 2.116(C)(10) on this basis.

## B. EXCLUSION

The second part of the inquiry requires us to consider whether Inhmathong's homeowner's insurance policy excluded coverage based on her purported expectation that the injury would occur. There is at least a genuine issue of material fact regarding whether the shooting was a natural and foreseeable consequence of Inhmathong's choice to allow Le-Nguyen to reside in her home and keep firearms there. The trial court erred by granting summary disposition under MCR 2.116(C)(10) on this ground.

"Exclusionary clauses in insurance policies are strictly construed in favor of the insured." *Auto-Owners v Churchman*, 440 Mich 560, 567; 489 NW2d 431 (1992). Regardless, "coverage under a policy is lost if any exclusion within the policy applies to an insured's particular claims." *Id*. "Clear and specific exclusions must be given effect." *Id*. Inhmathong's homeowner's insurance policy excludes coverage for bodily injuries that were "expected or intended" by an insured, even if they were "of a different kind, quality or degree than initially expected or intended" or "sustained by a different person, entity or property than initially expected or intended." Our Supreme Court has repeatedly held that the "expected or intended" language used in exclusionary clauses is clear and unambiguous as applied to a variety of factual contexts. See *Harrington*, 455 Mich at 383. Bodily injury is expected or intended if it is the "natural, foreseeable, expected, and anticipated result of the insured's intentional acts." *Freeman*, 432 Mich at 687 (quotation marks and brackets omitted).

On appeal, CAD and American Select both contend that our opinion in *Vanguard*, 184 Mich App 799, supports their respective positions. While *Vanguard* addressed a scenario somewhat similar to the facts at hand, our ultimate holding concerned an issue that is not in dispute in the present case. There, Edward Ellis, Jr., fatally shot Rozalyn Marshall. He shot her with a firearm owned by his father, Edward Ellis, Sr. At the time of the shooting, Ellis, Jr. was on parole for manslaughter and felony-firearm. Marshall's estate sued Ellis, Sr., alleging in part that he was negligent in failing to adequately monitor, control, or supervise his son and in allowing his son to gain access to a loaded firearm despite his knowledge that his son was dangerous. *Id*. at 801-802. Ellis, Sr., sought coverage for defense and indemnity under his homeowner's insurance policy. *Id*. at 802. His insurer—Vanguard Insurance Company, in turn, filed a declaratory-judgment action

asserting that it had no duty to defend or indemnify Ellis, Sr., because his insurance policy excluded coverage for bodily injury "expected or intended from the standpoint of the Insured." *Id*. Vanguard successfully moved for summary disposition, and Marshall's estate appealed. *Id*. at 800. The parties agreed that Ellis, Jr., was an additional insured under his father's homeowner's insurance policy, and their primary dispute concerned the interpretation of exclusionary language referring to bodily injury expected or intended from the standpoint of "the insured." *Id*. at 803-804. Vanguard contended that "the insured" referred to bodily injury expected or intended from the standpoint of any insured, whereas Marshall's estate contended that "the insured" referred to bodily injury expected or intended from the standpoint of the specific insured who engaged in the harmful conduct. *Id*. We agreed with Marshall's estate and concluded as follows:

> [E]xclusionary language referring to the conduct by "an insured" excludes coverage to all insureds on the basis of the conduct of any insured. However, where, as in the case at bar, the exclusionary clause refers to the conduct of "the insured," coverage is only precluded as to the particular insured who engaged in the conduct and not as to any other insured covered by the same policy.
>
> Accordingly, we hold that the fact that the injury inflicted by Ellis, Jr., may have been expected or intended by Ellis, Jr., does not relieve [Vanguard] of its duty to defend and indemnify Ellis, Sr., if the injury was not also intended or expected by Ellis, Sr. In sum, the trial court erred by concluding that [Vanguard] owed no duty to defend and indemnify Ellis, Sr., on the basis of the fact that the injury inflicted upon [the] decedent by Ellis, Jr., was intended or expected by Ellis, Jr.

Because *Vanguard* did not go on to address whether Ellis, Sr., intended or expected that Ellis, Jr., would harm Marshall, it does not control here. The relevant inquiry in this case is whether CAD's injuries were the natural, foreseeable, expected, and anticipated result of Inhmathong permitting Le-Nguyen to reside in her home, where he kept firearms.

Again, Inhmathong testified during her deposition that she as at work when Le-Nguyen shot CAD and did not have first-hand knowledge of the events. Inhmathong characterized her relationship with her neighbors as cordial. She knew that the neighborhood children frequently ran on her front lawn but did not mind that they did so. She did not know whether Le-Nguyen had any "problems" with the neighborhood children before he shot CAD, nor did she receive any complaints from her neighbors about Le-Nguyen's behavior. She knew that Le-Nguyen had at least one firearm in her home and did not approve but described the shooting as an "isolated and unusual" incident based on what she knew about Le-Nguyen's behavior. Le-Nguyen's testimony was largely consistent with Inhmathong's. He testified regarding his belief that Inhmathong's home was in a dangerous neighborhood because there were shootings and break-ins in the area, and he spoke to Inhmathong "[a] couple of times" about the neighborhood children running on the front lawn and leaving garbage in the yard. Additionally, Daniel testified that he knew Le-Nguyen before the shooting occurred and described their relationship as "cordial." Daniel was never involved in any "conflict or confrontation" with Le-Nguyen. He also had "minimal interaction" with Inhmathong and described Le-Nguyen and Inhmathong as "good neighbors." In light of this testimony, Inhmathong knew that Le-Nguyen kept a gun in her home and had at least some concern about neighborhood children running on the front lawn and leaving garbage in the yard. While this may be enough to establish a genuine issue of material fact regarding whether the shooting

was a natural and foreseeable consequence of Inhmathong's choice to allow Le-Nguyen to reside in her home with firearms, it does not establish as a matter of law that Inhmathong intended or expected that the shooting would occur. Accordingly, summary disposition was not warranted under MCR 2.116(C)(10) on this basis.

## IV. CONCLUSION

We reverse and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Noah P. Hood
/s/ Christopher M. Murray